IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Commonwealth Business Credit, LLC, | ) | CASE NO. 21-31507 |
| Debtor. | ) | Chapter 7 |
| | ) | Hon. John P. Gustafson |
| | ) | |

\* \* \* \* \*

## LIMITED OBJECTION OF WATERFORD BANK, N.A.
## TO MOTION FOR TURNOVER AND ACCOUNTING

For its Limited Objection to the Motion for Turnover and Accounting filed by Trustee Ericka Parker ("Trustee"), Waterford Bank, N.A. ("Waterford") states the following:

1.     Waterford is a secured creditor of the Debtor Commonwealth Business Credit, LLC ("Debtor"). As of September 27, 2021, Waterford was owed $2,757,583.84 plus legal fees and expenses.

2.     The Debtor's obligations to Waterford arose out of a Revolving Term Note which was amended from time to time and which was to be used for financing the factoring business of the Debtor. A copy of the Amended and Restated Note is attached hereto as Exhibit A.

3.     To secure payment of the Note and performance of the other terms and conditions in various loan documents executed by Debtor in favor of Waterford, the Debtor executed a Security Agreement that granted a lien in favor of Waterford on all of the personal property owned by the Debtor (the "Collateral"). A copy of the Security Agreement is attached as Exhibit B. The security interest of Waterford was perfected by the filing of a UCC Financing Statement in the Office of the Ohio Secretary of State on August 16, 2018. A copy of the UCC Financing Statement is attached hereto as Exhibit C.

4.     Waterford filed a Motion for Relief from Stay and Abandonment on October 20, 2021 (Docket 36) to permit it to exercise its rights to collect accounts owed to the Debtor and accounts owed to the Debtor's customers that were purportedly factored by the Debtor. The Trustee's Motion for Turnover was filed later on that same day (Docket 37).

5.     Waterford has been the victim of falsified borrowing base certificates based upon which Waterford extended credit to the Debtor. As it turns out, the basis for requests for advances by the Debtor were either fictitious or otherwise fraudulent. It appears without question that the Collateral of Waterford is woefully inadequate. This has been confirmed in telephone conversations by counsel for Waterford with the investigator of the Ohio Division of Securities who is investigating a wide variety of misconduct by Richard Scheich and James DelVerne, the principals of the Debtor and various other entities.

6.     The Debtor's schedules reflect this state of affairs. Part 11 of the Debtor's Schedule of Assets lists "Notes Receivable" and it appears from Waterford's investigation to date that in fact only the Sterling Commercial Credit, LLC note in the amount of $842,247.00 will probably be collectible. The obligors listed at Nos. 2-6 are related companies owned also by Scheich and DelVerne and would appear to be insolvent and uncollectible. Obligor Nos. 7 and 8 also shown as uncollectible have been confirmed by the Ohio Division of Securities likely to be so.

21-31507-jpg    Doc 43    FILED 11/05/21    ENTERED 11/05/21 12:53:30    Page 2 of 22

7. Waterford unquestionably lacks any equity in the Collateral which it believed it had and relief from stay is appropriate. Turnover of the small amounts now being collected to the Trustee is not warranted because of Waterford's perfected security interest.

8. Waterford has no objection to turning over the documents requested by the Trustee and will do so. Waterford also has no objection to providing monthly reports of amounts collected by Waterford to apply against the Debtor's secured obligations to Waterford. However, Waterford should not be required to turn over the amounts collected by Waterford.

In sum, Waterford is willing to turn over all of the documents requested by the Trustee and provide an accounting of the amount that it has collected but is not required to turn over funds collected due to the fact that it is a perfected secured creditor and the money being collected is being applied to its secured debt.

Respectfully submitted,

Dated: November 5, 2021

/s/ Thomas W. Heintschel
Thomas W. Heintschel (0008887)
Frederickson, Heintschel & King Co., L.P.A.
405 Madison Avenue, Suite 1212
Toledo, Ohio 43604
Phone: (419) 242-5100
Fax: (419) 242-5556
Email: theintschel@fhk-law.com
Attorney for Waterford Bank, N.A.

3

## CERTIFICATE OF SERVICE

I, Thomas W. Heintschel, do hereby certify that a copy of this Limited Objection of Waterford Bank, N.A. to Motion for Turnover and Accounting was sent this 5th day of November, 2021, to the list of creditors and/or interested parties listed below.

/s/ Thomas W. Heintschel
Thomas W. Heintschel (0008887)

**Notice will be electronically mailed to:**

Patricia B. Fugee — partricia.fugee@fisherbroyles.com,cpbfl 1@trustesolutions.net
Scot A. Hinshaw — hinshaw@nwklaw.com
Brian C. Kalas — kalas@nwklaw.com
Eric R. Neuman — eric@drlawllc.com,kim@drlawllc.com;r50765@notify, bestcase.com;Adam@drlawllc.com;raymond@drlawllc.com; 1eanne@drlawllc.com
Ericka S. Parker, Trustee — esparker@bcglobal.net, oho4@ecfcbis.com
United States Trustee — (Registered address)@usdoj.gov

4

DocuSign Envelope ID: 06C437F2-FD82-4E36-AEAC-496972F67650

# SEVENTH AMENDED AND RESTATED
# REVOLVING TERM NOTE

**May 31, 2021**

**$2,750,000.00**

Toledo, Ohio

For value received, the undersigned **Commonwealth Business Credit, LLC, an Ohio limited liability company**, with an address of **7659 Kings Pointe Road, Toledo, Ohio 43617** (the "Borrower"), promises to pay to the order of Waterford Bank, N.A., a National Banking Association with an address of 3900 N. McCord Rd, Toledo, Ohio 43617 (together with its successors and assigns, the "Bank"), the principal amount of **Two Million, Seven Hundred Fifty Thousand Dollars and Zero Cents** (**$2,750,000.00**), or, if less, such amount as may be the aggregate unpaid principal amount of all loans or advances made by the Bank to the Borrower pursuant hereto, on or before **June 30, 2021** (the "Maturity Date"), together with interest from the date hereof on the unpaid principal balance from time to time outstanding until paid in full. The aggregate principal balance outstanding shall bear interest thereon at a per annum rate equal to **One Percent** (**1.00%**) above the Wall Street Journal Prime Rate (as hereinafter defined). The current Wall Street Journal Prime Rate is **Three and One-Quarter Percent** (**3.25%**) and the initial applicable interest rate is equal to **4.25%** until changed in accordance with the terms of this Note. All accrued and unpaid interest shall be payable monthly in arrears on the 7th day of each month, commencing on **June 7, 2021**.

Wall Street Journal Prime Rate means the rate published from time to time by the Wall Street Journal as the Prime Rate on corporate loans posted by at least 70% of the 10 largest U.S. banks, or, in the event the Wall Street Journal ceases publication of the Prime Rate, the base, reference or other rate then designated by the Bank, in its sole discretion, for general commercial loan reference purposes, it being understood that such rate is a reference rate, not necessarily the lowest, established from time to time, which serves as the basis upon which effective interest rates are calculated for loans making reference thereto.

The effective interest rate applicable to the Borrower's loans evidenced hereby shall change on the date of each change in the Wall Street Journal Prime Rate.

This Note is secured by all collateral granted to the Bank by the Borrower or any endorser or guarantor hereof or by any other party and shall be secured by any additional collateral hereafter granted to the Bank by the Borrower or any endorser or guarantor hereof or by any other party.

This Note is an amendment and restatement of that certain **$2,500,000.00** Revolving Term Note, dated **August 16, 2018** (the "Original Note"), as amended by that certain Amended and Restated Revolving Term Note, dated **August 7, 2019** in the principal amount of **$2,500,000.00** (the "Amended Note"), as amended by that certain Amended and Restated Revolving Term Note, dated **October 17, 2019** in the principal amount of **$2,750,000.00**, as amended by that certain Third Amended and Restated Revolving Term Note, dated **October 17, 2019** in the principal amount of **$2,750,000.00**, as amended by that certain Fourth Amended and Restated Term Note, dated **October 7, 2020** in the principal amount of **$2,750,000.00**, as amended by that certain Fifth Amended and Restated Revolving Term Note, dated **December 7, 2020** in the principal amount of **$2,750,000.00**, as amended by that certain Sixth Amended and Restated Revolving Term Note, dated **March 7, 2021** in the principal amount of **$2,750,000.00** (collectively, the "Amended Note"), by the Borrower in favor of the Bank and shall be secured to the same extent and with the same priority as the Original Note and the Amended Note.

Principal and interest shall be payable at the Bank's main office or at such other place as the Bank may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of

EXHIBIT "A"

days elapsed and a 360-day year.

This Note is a revolving note and, subject to the foregoing and in accordance with the provisions hereof and of any and all other agreements between the Borrower and the Bank related hereto, the Borrower may, at its option, borrow, pay, prepay and reborrow hereunder at any time prior to the Maturity Date or such earlier date as the obligations of the Borrower to the Bank under this Note, and any other agreements between the Bank and the Borrower related hereto, shall become due and payable, or the obligation of the Bank to extend financial accommodations to the Borrower shall terminate; provided, however, that in any event the principal balance outstanding hereunder shall at no time exceed the face amount of this Note. This Note shall continue in full force and effect until all obligations and liabilities evidenced by this Note are paid in full and the Bank is no longer obligated to extend financial accommodations to the Borrower, even if, from time to time, there are no amounts outstanding respecting this Note.

At the option of the Bank, this Note shall become immediately due and payable without notice or demand upon the occurrence at any time of any of the following events of default (each, an "Event of Default"): (1) default of any liability, obligation, covenant or undertaking of the Borrower, any endorser or any guarantor hereof to the Bank, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Borrower, any endorser or any guarantor hereof under any other loan document delivered by the Borrower, any endorser or any guarantor, or in connection with the loan evidenced by this Note or any other agreement by the Borrower, any endorser or any guarantor with the Bank; (2) failure of the Borrower, any endorser or any guarantor hereof to maintain aggregate collateral security value satisfactory to the Bank; (3) default of any material liability, obligation or undertaking of the Borrower, any endorser or any guarantor hereof to any other party; (4) if any statement, representation or warranty heretofore, now or hereafter made by the Borrower, any endorser or any guarantor hereof in connection with the loan evidenced by this Note or in any supporting financial statement of the Borrower, any endorser or any guarantor hereof shall be determined by the Bank to have been false or misleading in any material respect when made; (5) if the Borrower, any endorser or any guarantor hereof is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property; (6) the death of the Borrower, any endorser or any guarantor hereof and, if the Borrower, any endorser or any guarantor hereof is a partnership or limited liability company, the death of any partner or member; (7) the institution by or against the Borrower, any endorser or any guarantor hereof of any proceedings under the Bankruptcy Code 11 USC §101 *et seq.* or any other law in which the Borrower, any endorser or any guarantor hereof is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Borrower, any endorser or any guarantor hereof of an assignment for the benefit of creditors or the granting by the Borrower, any endorser or any guarantor hereof of a trust mortgage for the benefit of creditors; (8) the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower, any endorser or any guarantor hereof; (9) a judgment or judgments for the payment of money shall be rendered against the Borrower, any endorser or any guarantor hereof, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution; (10) any levy, lien (including mechanics lien) except as permitted under any of the other loan documents between the Bank and the Borrower, seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower, any endorser or any guarantor hereof; (11) the termination or revocation of any guaranty hereof; or (12) the occurrence of such a change in the condition or affairs (financial or otherwise) of the Borrower, any endorser or any guarantor hereof, or the occurrence of any other event or circumstance, such that the Bank, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of the Borrower, any endorser or any guarantor hereof to the Bank has been or may be impaired.

Any payments received by the Bank on account of this Note shall, at the Bank's option, be applied first, to accrued and unpaid interest; second, to the unpaid principal balance hereof; third to any costs, expenses or charges then owed to the Bank by the Borrower; and the balance to escrows, if any. Notwithstanding the foregoing, any payments received after the occurrence and during the continuance of an Event of Default shall be applied in such manner as the Bank may determine. The Borrower hereby authorizes the Bank to charge any deposit account which the Borrower may maintain with the Bank for any

2

DocuSign Envelope ID: 06C437F2-FD82-4E36-AEAC-496972F67650

payment required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Bank that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224. This Note is a "contract of indebtedness" pursuant to §1319.02 of the Ohio Revised Code.**

The Borrower and each endorser and guarantor hereof grant to the Bank a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Bank to the Borrower and/or each endorser or guarantor hereof and any cash, securities, instruments or other property of the Borrower and each endorser and guarantor hereof in the possession of the Bank, whether for safekeeping or otherwise, or in transit to or from the Bank (regardless of the reason the Bank had received the same or whether the Bank has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower and/or any endorser or guarantor hereof to the Bank and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower or any endorser or guarantor hereof to the Bank at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Bank.

No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Bank, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and every endorser or guarantor of this Note, regardless of the time, order or place of signing, waive presentment, demand, protest, notice of intent to accelerate, notice of acceleration and all other notices of every kind in connection with the delivery, acceptance, performance or enforcement of this Note and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral. To the maximum extent permitted by law, the Borrower and each endorser and guarantor of this Note waive and terminate any homestead rights and/or exemptions respecting any premises under the provisions of any applicable homestead laws, including without limitation Section 2329.66 of the Ohio Revised Code.

The Borrower and each endorser and guarantor of this Note shall indemnify, defend and hold the Bank and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless against any claim brought or threatened against any Indemnitee by the Borrower, by any endorser or guarantor, or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Bank's relationship with the Borrower or any endorser or guarantor hereof (each of which may be defended, compromised, settled or pursued by the Bank with counsel of the Bank's selection, but at the expense of the Borrower and any endorser and/or guarantor), except for any claim arising out of the gross negligence or willful misconduct of the Bank.

The Borrower and each endorser and guarantor of this Note agree to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to prime plus 5.0%. If any payment due under this Note is unpaid for 10 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Bank's other remedies on account thereof),

3

DocuSign Envelope ID: 06C437F2-FD82-4E36-AEAC-496972F67650

a late charge equal to the greater of $20.00 or 5.0% of such unpaid amount.

This Note shall be binding upon the Borrower and each endorser and guarantor hereof and upon their respective heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Bank and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any endorser or guarantor of this Note are joint and several; provided, however, the release by the Bank of the Borrower or any one or more endorsers or guarantors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any endorser or guarantor of this Note are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Bank. Each reference in this Note to the Borrower and each Borrower, if more than one, and endorser or guarantor of this Note, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Bank of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Bank of any collateral shall not release any person obligated on account of this Note.

The Borrower and each endorser and guarantor hereof each authorizes the Bank to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Bank, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

This Note shall be governed by federal law applicable to the Bank and, to the extent not preempted by federal law, the laws of the State of Ohio.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Bank at the address set forth in this Note or as any party may from time to time designate by written notice to the other party.

The Borrower and each endorser and guarantor of this Note each irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Ohio, over any suit, action or proceeding arising out of or relating to this Note. Each of the Borrower and each endorser and guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Each of the Borrower and each endorser and guarantor hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, endorser's or guarantor's address shown below or as notified to the Bank and (ii) by serving the same upon the Borrower(s), endorser(s) or guarantor(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower or such endorser or guarantor.

**THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER, EACH ENDORSER AND GUARANTOR TO THE BANK, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER, EACH ENDORSER AND GUARANTOR AND THE BANK EACH CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

4

DocuSign Envelope ID: 06C437F2-FD82-4E36-AEAC-496972F67650

<u>Warrant of Attorney</u>. Each of the undersigned authorizes any attorney at law to appear in any Court of Record in the State of Ohio or in any other state or territory of the United States after the above indebtedness becomes due, whether by acceleration or otherwise, to waive the issuing and service of process, and to confess judgment against any one or more of the undersigned in favor of the Bank for the amount then appearing due together with costs of suit, and thereupon to waive all error and all rights of appeal and stays of execution. No such judgment or judgments against less than all of the undersigned shall be a bar to a subsequent judgment or judgments against any one or more of the undersigned against whom judgment has not been obtained hereon; this being a joint and several warrant of attorney to confess judgment. The attorney at law authorized hereby to appear for the undersigned may be an attorney at law representing the Bank, and the undersigned hereby expressly waive any conflict of interest that may exist by virtue of such representation. The undersigned also agree that the attorney acting for the undersigned as set forth in this section may be compensated by the Bank for such services.

---

**WARNING--BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

---

Borrower:

Commonwealth Business Credit, LLC, an Ohio limited liability company

By: *Richard A. Scheich*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Richard A. Scheich, Member

By: *[signature]*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
James DeVerne, Member

7659 Kings Pointe Road
Toledo, Ohio
43617

5

# SEVENTH AMENDED AND RESTATED LOAN AGREEMENT

This SEVENTH AMENDED AND RESTATED LOAN AGREEMENT is entered into at Toledo, Ohio as of **May 31, 2021**, between **Commonwealth Business Credit, LLC, an Ohio limited liability company**, with its chief executive office located at **7659 Kings Pointe Road, Toledo, Ohio 43617** (the "Borrower") and Waterford Bank, N.A., a National Banking Association, with an address of 3900 N. McCord Rd, Toledo, Ohio 43617 (the "Bank").

WHEREAS, the Borrower and the Bank entered into a Loan Agreement ("Agreement") as of August 16, 2018;

WHEREAS, the Borrower and Bank entered into an Amended and Restated Loan Agreement ("Amended Agreement") as of August 7, 2019;

WHEREAS, the Borrower and Bank entered into a Second Amended and Restated Loan Agreement ("Amended Agreement") as of October 7, 2019, October 17, 2019, October 7, 2020, December 7, 2020 and March 7, 2021;

WHEREAS, the Borrower and Bank desire to further amend the Loan Agreement as provided herein.

NOW THEREFORE, in consideration of the premises, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Loan Agreement, as amended by the Amended Agreement is hereby further amended as follows:

"1.1    Revolving Loans. Bank agrees, in its sole discretion, to make revolving loans (the "Revolving Loans") to or for the account of Borrower, upon Borrower's request therefor, in an aggregate amount of up to **Two Million Seven Hundred Fifty Thousand Dollars and Zero Cents ($2,750,000.00)** (the "Revolving Loan Amount"), provided there is no continuing uncured Event of Default (as hereinafter defined) and subject to the terms and conditions set forth herein, but in no event in excess of the Borrowing Base, as such term is hereinafter defined and as calculated in a borrowing base certificate in the form of Exhibit A, attached hereto, and delivered to the Bank prior to each advance under the Revolving Loan or as otherwise required by the Bank. Loan advances respecting Revolving Loans are unconditionally cancellable at any time at the Bank's discretion. The Revolving Loans shall be evidenced by that certain Amended and Restated Revolving Term Note, of even date herewith (the "Revolving Note"), by Commonwealth Business Credit, LLC in favor of the Bank in the face amount of the Revolving Loan Amount. The Bank's agreement to make any advances pursuant to this Agreement and evidenced by the Revolving Note shall expire on **June 30, 2021**. This Agreement, the Revolving Note, and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing are collectively hereinafter referred to as the "Loan Documents".

All of the remaining terms and provisions of the Agreement are adopted by reference as if fully restated herein.

Borrower:

Commonwealth Business Credit, LLC, an Ohio limited liability company

By: Richard A. Scheich
Richard A. Scheich, Member

By: _____
James DelVerne, Member

Accepted: Waterford Bank, N.A.,
a National banking association

By: Craig Jones
Craig Jones, Senior Vice President

# SECURITY AGREEMENT

This SECURITY AGREEMENT (this "Agreement") is entered into at Toledo, Ohio, as of **August 16, 2018**, between **Commonwealth Business Credit, LLC, an Ohio limited liability company**, with its chief executive office located at **7659 Kings Pointe Road, Toledo, Ohio 43617** (the "Borrower") and Waterford Bank, N.A., a National Banking Association, with an address of 3900 N. McCord Rd, Toledo, Ohio 43617 (the "Bank").

FOR VALUE RECEIVED, and in consideration of the granting by the Bank of financial accommodations to or for the benefit of the Borrower, including without limitation respecting the Obligations (as hereinafter defined), the Borrower represents to and agrees with the Bank, as of the date hereof and as of the date of each loan, credit and/or other financial accommodation, as follows:

## 1. GRANT OF SECURITY INTEREST

1.1     <u>Grant of Security Interest</u>. In consideration of the Bank's extending credit and other financial accommodations to or for the benefit of the Borrower, the Borrower hereby grants to the Bank a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined). The security interest granted by this Agreement is given to and shall be held by the Bank as security for the payment and performance of all Obligations (as hereinafter defined), including without limitation, all amounts due and owing to the Bank and all obligations respecting that certain **Revolving Term Note**, dated **August 16, 2018**, by **Commonwealth Business Credit, LLC** in favor of the Bank in the original principal amount of $2,500,000.00 (the "Note"; and collectively, along with all other agreements, documents, certificates and instruments delivered in connection therewith, the "Loan Documents"), and any substitutions, modifications, extensions or amendments to any of the Loan Documents.

1.2     <u>Definitions</u>. The following definitions shall apply:

    (a)     "Code" shall mean the Ohio Uniform Commercial Code, Ohio Revised Code Chapter 1309 as amended from time to time.

    (b)     "Collateral" shall mean all of the Borrower's present and future right, title and interest in and to any and all of the personal property of the Borrower whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time, including without limitation:

        (i)     accounts;

        (ii)     chattel paper;

        (iii)     goods;

        (iv)     inventory;

        (v)     equipment;

EXHIBIT "B"

(vi)     fixtures

(vii)    farm products;

(viii)   instruments;

(ix)     investment property;

(x)      documents;

(xi)     commercial tort claims;

(xii)    deposit accounts;

(xiii)   letter-of-credit rights;

(xiv)    general intangibles;

(xv)     supporting obligations; and

(xvi)    records of, accession to and proceeds and products of the foregoing.

(c)     "Debtors" shall mean the Borrower's customers who are indebted to the Borrower.

(d)     "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by the Borrower to the Bank at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by the Borrower to the Bank; or are due indirectly by the Borrower to the Bank as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to the Bank, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Loan Documents. Said term shall also include all interest and other charges chargeable to the Borrower or due from the Borrower to the Bank from time to time and all costs and expenses referred to in this Agreement.

(e)     "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

All words and terms used in this Agreement other than those specifically defined herein shall have the meanings accorded to them in the Code.

1.3     Ordinary Course of Business. The Bank hereby authorizes and permits the Borrower to hold, process, sell, use or consume in the manufacture or processing of finished goods, or otherwise dispose of inventory for fair consideration, all in the ordinary course of the Borrower's business, excluding, without limitation, sales to creditors or in bulk or sales or other dispositions occurring under circumstances which would or could create any lien or interest adverse to the Bank's security interest or other right hereunder in the proceeds resulting therefrom. The Bank also hereby authorizes and permits the Borrower to receive from the Debtors all amounts due as proceeds of the Collateral at the Borrower's own cost and expense, and also liability, if any, subject to the direction and control of the Bank at all times; and the Bank may at any time, without cause or notice, and whether or not an Event of Default has occurred or demand has been made, terminate all or any part of the authority and permission herein or elsewhere in this Agreement granted to the Borrower with reference to the Collateral, and notify Debtors to make all payments due as proceeds of the Collateral to the Bank. Until Bank shall otherwise notify Borrower, all

2

proceeds of and collections of Collateral shall be retained by Borrower and used solely for the ordinary and usual operation of Borrower's business. From and after notice by Bank to Borrower, all proceeds of and collections of the Collateral shall be held in trust by Borrower for Bank and shall not be commingled with Borrower's other funds or deposited in any Bank account of Borrower; and Borrower agrees to deliver to Bank on the dates of receipt thereof by Borrower, duly endorsed to Bank or to bearer, or assigned to Bank, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.

1.4     Allowances. Absent an Event of Default the Borrower may grant such allowances or other adjustments to Debtors (exclusive of extending the time for payment of any item which shall not be done without first obtaining the Bank's written consent in each instance) as the Borrower may reasonably deem to accord with sound business practice, including, without limiting the generality of the foregoing, accepting the return of all or any part of the inventory (subject to the provisions set forth in this Agreement with reference to returned inventory).

1.5     Records. The Borrower shall hold its books and records relating to the Collateral segregated from all the Borrower's other books and records in a manner satisfactory to the Bank; and shall deliver to the Bank from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of shipment or delivery of the merchandise or of the rendering of services; and the Borrower will deliver to the Bank promptly at the Bank's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of inventory, schedules of accounts and such other writings as the Bank may in its sole discretion deem to be necessary or effectual to evidence any loan hereunder or the Bank's security interest in the Collateral.

1.6     Legends. The Borrower shall promptly make, stamp or record such entries or legends on the Borrower's books and records or on any of the Collateral (including, without limitation, chattel paper) as Bank shall request from time to time, to indicate and disclose that Bank has a security interest in such Collateral.

1.7     Inspection. The Bank, or its representatives, at any time and from time to time, shall have the right at the sole cost and expense of Borrower, and the Borrower will permit the Bank and/or its representatives: (a) to examine, check, make copies of or extracts from any of the Borrower's books, records and files (including, without limitation, orders and original correspondence); (b) to perform field exams or otherwise inspect and examine the Collateral and to check, test or appraise the same as to quality, quantity, value and condition; and (c) to verify the Collateral or any portion or portions thereof or the Borrower's compliance with the provisions of this Agreement.

1.8     Purchase Money Security Interests. To the extent the Borrower uses proceeds of any loans to purchase Collateral, the repayment of such loans shall be on a "first-in-first-out" basis so that the portion of the loan used to purchase a particular item of Collateral shall be repaid in the order in which Borrower purchased such item of Collateral.

1.9     Search Reports. Bank shall receive prior to the date of this Agreement UCC search results under all names used by the Borrower during the prior five (5) years, from each jurisdiction where any Collateral is located, from the State, if any, where the Borrower is organized and registered (as such terms are used in the Code), and the State where the Borrower's chief executive office is located. The search results shall confirm that the security interest in the Collateral granted Bank hereunder is prior to all other security interests in favor of any other person.

## 2.     REPRESENTATIONS AND WARRANTIES

2.1     Accounts and Contract Rights. All accounts arise out of legally enforceable and existing contracts, and represent unconditional and undisputed bona fide indebtedness by a Debtor, and are not

3

and will not be subject to any discount (except such cash or trade discount as may be shown on any invoice, contract or other writing delivered to the Bank). No contract right, account, general intangible or chattel paper is or will be represented by any note or other instrument, and no contract right, account or general intangible is, or will be represented by any conditional or installment sales obligation or other chattel paper, except such instruments or chattel paper as have been or immediately upon receipt by the Borrower will be delivered to the Bank (duly endorsed or assigned), such delivery, in the case of chattel paper, to include all executed copies except those in the possession of the installment buyer and any security for or guaranty of any of the Collateral shall be delivered to the Bank immediately upon receipt thereof by the Borrower, with such assignments and endorsements thereof as the Bank may request.

2.2     Location of Collateral. Except for sale, processing, use, consumption or other disposition in the ordinary course of business, the Borrower will keep all inventory and equipment only at locations specified in this Agreement or specified to the Bank in writing. The Borrower shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each location where the Borrower's records relating to its accounts and contract rights, respectively, are kept, and shall not remove such records or any of them to another location without giving the Bank at least thirty (30) days prior written notice thereof.

2.3     Third Parties. The Bank shall not be deemed to have assumed any liability or responsibility to the Borrower or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to the Borrower by the Bank (which shall automatically be deemed to be without recourse to the Bank in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and the Bank, by accepting such security interest in the Collateral, or by releasing any Collateral to the Borrower, shall not be deemed to have assumed any obligation or liability to any supplier or Debtor or to any other third party, and the Borrower agrees to indemnify and defend the Bank and hold it harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

2.4     Payment of Accounts. Each account or other item of Collateral, other than inventory and equipment, will be paid in full on or before the date shown as its due date in the schedule of Collateral, in the copy of the invoice(s) relating to the account or other Collateral or in contracts relating thereto. Upon any suspension of business, assignment or trust mortgage for the benefit of creditors, dissolution, petition in receivership or under any chapter of the Bankruptcy Code as amended from time to time by or against any Debtor, any Debtor becoming insolvent or unable to pay its debts as they mature or any other act of the same or different nature amounting to a business failure, the Borrower will immediately notify the Bank thereof.

## 3.     AFFIRMATIVE COVENANTS

3.1     Inspection. Borrower will at all reasonable times make its books and records available in its offices for inspection, examination and duplication by the Bank and the Bank's representatives and will permit inspection of the Collateral and all of its properties by the Bank and the Bank's representatives. Borrower will from time to time furnish the Bank with such information and statements as the Bank may request in its sole discretion with respect to the Obligations or the Bank's security interest in the Collateral. Borrower shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights are kept, and shall not remove such records to another location without giving the Bank at least thirty (30) days prior written notice thereof.

3.2     Notice to Account Debtors. The Borrower agrees, at the request of the Bank, to notify all or any of the Debtors in writing of the Bank's security interest in the Collateral in whatever manner the Bank requests and, hereby authorizes the Bank to notify all or any of the Debtors of the Bank's security interest in the Borrower's accounts at the Borrower's expense.

4

## 4. DEFAULT

4.1  Default. "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a)  default of any liability, obligation, covenant or undertaking of the Borrower or any guarantor of the Obligations to the Bank, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or interest or default of the Borrower or any guarantor of the Obligations under any other Loan Document or any other agreement with the Bank;

(b)  failure of the Borrower or any guarantor of the Obligations to maintain aggregate collateral security value satisfactory to the Bank;

(c)  default of any material liability, obligation or undertaking of the Borrower or any guarantor of the Obligations to any other party;

(d)  if any statement, representation or warranty heretofore, now or hereafter made by the Borrower or any guarantor of the Obligations in connection with this Agreement or in any supporting financial statement of the Borrower or any guarantor of the Obligations shall be determined by the Bank to have been false or misleading in any material respect when made;

(e)  if the Borrower or any guarantor of the Obligations is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on actively its present business or the appointment of a receiver for its property;

(f)  the death of the Borrower or any guarantor of the Obligations and, if the Borrower or any guarantor of the Obligations is a partnership or limited liability company, the death of any partner or member;

(g)  the institution by or against the Borrower or any guarantor of the Obligations of any proceedings under the Bankruptcy Code 11 USC §101 et seq. or any other law in which the Borrower or any guarantor of the Obligations is alleged to be insolvent or unable to pay its debts as they mature, or the making by the Borrower or any guarantor of the Obligations of an assignment for the benefit of creditors or the granting by the Borrower or any guarantor of the Obligations of a trust mortgage for the benefit of creditors;

(h)  the service upon the Bank of a writ in which the Bank is named as trustee of the Borrower or any guarantor of the Obligations;

(i)  a judgment or judgments for the payment of money shall be rendered against the Borrower or any guarantor of the Obligations, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

(j)  any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower or any guarantor of the Obligations;

(k)  the termination or revocation of any guaranty of the Obligations; or

(l)  the occurrence of such a change in the condition or affairs (financial or otherwise) of the Borrower or any guarantor of the Obligations, or the occurrence of any other event or circumstance, such that the Bank, in its sole discretion, deems that it is insecure or that the

5

prospects for timely or full payment or performance of any obligation of the Borrower or any guarantor of the Obligations to the Bank has been or may be impaired.

4.2    Acceleration.  If an Event of Default shall occur, at the election of the Bank, all Obligations shall become immediately due and payable without notice or demand, except with respect to Obligations payable on DEMAND, which shall be due and payable on DEMAND, whether or not an Event of Default has occurred.

The Bank is hereby authorized, at its election, after an Event of Default or after Demand, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at public or private sale; and the Bank may also exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it in equity or at law, all as Bank may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral.  If notice of a sale or other action by the Bank is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Borrower agrees that ten (10) days written notice to the Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, the Bank, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations.  Any sale (public or private) shall be without warranty and free from any right of redemption, which the Borrower shall waive and release after default upon the Bank's request therefor, and may be free of any warranties as to the Collateral if Bank shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money.  Any balance of the net proceeds of sale remaining after paying all Obligations of the Borrower to the Bank shall be returned to such other party as may be legally entitled thereto; and if there is a deficiency, the Borrower shall be responsible for repayment of the same, with interest.  Upon demand by the Bank, the Borrower shall assemble the Collateral and make it available to the Bank at a place designated by the Bank which is reasonably convenient to the Bank and the Borrower.  The Borrower hereby acknowledges that the Bank has extended credit and other financial accommodations to the Borrower upon reliance of the Borrower's granting the Bank the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND and the Borrower hereby acknowledges that the Bank is entitled to equitable and injunctive relief to enforce any of its rights and remedies hereunder or under the Code and the Borrower hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to the Bank.

The Bank shall not be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guaranties shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that it lawfully may do so, the Borrower hereby agrees that it will not invoke and irrevocably waives the benefits of any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Bank's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed.  Except as required by applicable law, the Bank shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

4.3    Power of Attorney.  The Borrower hereby irrevocably constitutes and appoints the Bank as the Borrower's true and lawful attorney, with full power of substitution, at the sole cost and expense of the Borrower but for the sole benefit of the Bank, upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND, to convert the Collateral into cash, including,

6

without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the inventory and other Collateral; to enforce collection of the Collateral, either in its own name or in the name of the Borrower, including, without limitation, executing releases or waivers, compromising or settling with any Debtors and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to the Borrower and to take therefrom any remittances or proceeds of Collateral in which the Bank has a security interest; to notify Post Office authorities to change the address for delivery of mail addressed to the Borrower to such address as the Bank shall designate; to endorse the name of the Borrower in favor of the Bank upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of the Borrower on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to sign the name of the Borrower on any notice of the Debtors or on verification of the Collateral; and to sign, if necessary, and file or record on behalf of the Borrower any financing or other statement in order to perfect or protect the Bank's security interest. The Bank shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if the Bank elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be responsible to the Borrower except for its own gross negligence or willful misconduct. All powers conferred upon the Bank by this Agreement, being coupled with an interest, shall be irrevocable so long as any Obligation of the Borrower or any guarantor or surety to the Bank shall remain unpaid or the Bank is obligated under this Agreement to extend any credit to the Borrower.

4.4     Nonexclusive Remedies. All of the Bank's rights and remedies not only under the provisions of this Agreement but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Bank at such time or times and in such order of preference as the Bank in its sole discretion may determine.

## 5.     MISCELLANEOUS

5.1     Costs and Expenses. the Borrower shall pay to the Bank on demand any and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements, court costs, litigation and other expenses) incurred or paid by the Bank in establishing, maintaining, protecting or enforcing any of the Bank's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by the Bank in defending the Bank's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

5.2     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.

5.3     Severability. If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

5.4     Complete Agreement. This Agreement and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

5.5     Binding Effect of Agreement. This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Bank shall be entitled to rely thereon) until released in writing by the Bank. Notwithstanding any such termination, the Bank shall have a security

interest in all Collateral to secure the payment and performance of Obligations arising after such termination as a result of commitments or undertakings made or entered into by the Bank prior to such termination. The Bank may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights of the Bank; and the Bank shall then be relieved and discharged of any responsibility or liability with respect to this Agreement and the Collateral. The Borrower may not assign or transfer any of its rights or obligations under this Agreement. Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

5.6     Further Assurances.  Borrower will from time to time execute and deliver to Bank such documents, and take or cause to be taken, all such other or further action, as Bank may request in order to effect and confirm or vest more securely in Bank all rights contemplated by this Agreement and the other Loan Documents (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Bank the security interest in the Collateral granted to the Bank by this Agreement or to comply with applicable statute or law and to facilitate the collection of the Collateral (including, without limitation, the execution of stock transfer orders and stock powers, endorsement of promissory notes and instruments and notifications to obligors on the Collateral). To the extent permitted by applicable law, Borrower authorizes the Bank to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be filed at any time in any jurisdiction.  Bank may at any time and from time to time file financing statements, continuation statements and amendments thereto which contain any information required by the Code for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower. Borrower agrees to furnish any such information to Bank promptly upon request. In addition, Borrower shall at any time and from time to time take such steps as Bank may reasonably request for Bank (i) to obtain an acknowledgment, in form and substance satisfactory to Bank, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Bank, (ii) to obtain "control" (as defined in the Code) of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Bank, and (iii) otherwise to insure the continued perfection and priority of Bank's security interest in any of the Collateral and the preservation of its rights therein. Borrower hereby constitutes Bank its attorney-in-fact to execute, if necessary, and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are irrevocably paid in full and the Collateral is released.

5.7     Amendments and Waivers.  This Agreement may be amended and Borrower may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if Borrower shall obtain the Bank's prior written consent to each such amendment, action or omission to act. No course of dealing and no delay or omission on the part of Bank in exercising any right hereunder shall operate as a waiver of such right or any other right and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Bank on any future occasion.

5.8     Terms of Agreement.  This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Bank shall be outstanding, or the Bank shall have any obligation to extend any financial accommodation hereunder, and is supplementary to each and every other agreement between Borrower and Bank and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Bank or any of the liabilities, obligations or undertakings of Borrower under any such agreement, nor shall any contemporaneous or subsequent agreement between Borrower and the Bank be construed to limit or otherwise derogate from any of the rights or remedies of Bank or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

5.9     Notices.  Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record (within the meaning of Article 9 of the Code). Any notices under or pursuant to this

8

Agreement shall be deemed duly received and effective if delivered in hand to any officer or agent of the Borrower or Bank, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Bank at the address set forth in this Agreement or as any party may from time to time designate by written notice to the other party.

5.10    Governing Law.  This Agreement shall be governed by federal law applicable to the Bank and, to the extent not preempted by federal law, the laws of the State of Ohio.

5.11    Reproductions.  This Agreement and all documents which have been or may be hereinafter furnished by Borrower to the Bank may be reproduced by the Bank by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

5.12    Jurisdiction and Venue.  Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Ohio, over any suit, action or proceeding arising out of or relating to this Agreement.  Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.  Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's address shown in this Agreement or as notified to the Bank and (ii) by serving the same upon the Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

5.13    JURY WAIVER.  THE BORROWER AND BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED.  THE BORROWER CERTIFIES THAT NEITHER THE BANK NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

5.14    Warrant of Attorney.  Each of the undersigned authorizes any attorney at law to appear in any Court of Record in the State of Ohio or in any other state or territory of the United States after the above indebtedness becomes due, whether by acceleration or otherwise, to waive the issuing and service of process, and to confess judgment against any one or more of the undersigned in favor of the Bank for the amount then appearing due together with costs of suit, and thereupon to waive all error and all rights of appeal and stays of execution.  No such judgment or judgments against less than all of the undersigned shall be a bar to a subsequent judgment or judgments against any one or more of the undersigned against whom judgment has not been obtained hereon; this being a joint and several warrant of attorney to confess judgment.  The attorney at law authorized hereby to appear for the undersigned may be an attorney at law representing the Bank, and the undersigned hereby expressly waive any conflict of interest that may exist by virtue of such representation.  The undersigned also agree that the attorney acting for the undersigned as set forth in this Section may be compensated by the Bank for such services.

9

**WARNING--BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

Borrower:

Commonwealth Business Credit, LLC, an Ohio limited liability company

By: _____
    Richard A. Scheich, Member

By: _____
    James DelVeme, Member

Accepted: Waterford Bank, N.A.,
a National Banking association

By: _____
Name: Craig Jones
Title: Senior Vice President

10



# UCC FINANCING STATEMENT

**FOR FILING OFFICE USE ONLY**

**NAME OF CONTACT AT FILER:** CSC B2B User

**PHONE NUMBER:** (800)858-5294

**EMAIL CONTACT AT FILER:** FilingDept@Diligenz.com

**SEND ACKNOWLEDGEMENT TO:** Diligenz
801 Adlai Stevenson Drive
Springfield
IL
62703

## DEBTOR INFORMATION

**ORGANIZATION'S NAME:** Commonwealth Business Credit, LLC

**MAILING ADDRESS:** 7659 Kings Pointe Road

**CITY:** Toledo    **STATE:** OH    **POSTAL CODE:** 436617    **COUNTRY:** USA

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME:** Waterford Bank, N.A.

**MAILING ADDRESS:** 3900 N McCord Road

**CITY:** Toledo    **STATE:** OH    **POSTAL CODE:** 43617    **COUNTRY:** USA

## COLLATERAL INFORMATION

**This financing statement covers the following collateral:**

All personal property of Debtor of every kind and nature, wherever located, whether now owned or hereafter acquired, including without limitation, the following categories of property as defined in Article 9 of the Uniform Commercial Code: goods (including inventory, equipment, fixtures, farm products and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all records of, accessions to and products and proceeds of the foregoing.

Any term used herein which is defined in either (i) Article 9 of the Uniform Commercial Code as in effect in the

EXHIBIT "C"

jurisdiction in which this financing statement was signed or authenticated by the Debtor at the time it was so signed or authenticated or (ii) Article 9 of the Uniform Commercial Code as in effect at any relevant time in the jurisdiction in which this financing statement is filed, has the meaning to be ascribed thereto with respect to any particular item of property under the more encompassing of the two definitions. This financing statement covers, and is intended to cover, all personal property of the Debtor.

## FILING TYPE

Public Finance: No

Transmitting Utility: No

Manufactured Home: No

Non-Ucc Filling: No

Agriculture Lien: No

## ALTERNATIVE DESIGNATION

Licensee/Licensor: No

Consignee/Consignor: No

Bailee/Bailor: No

Seller/Buyer: No

## PACKET NUMBER

50863293